THEODORE B. GOULD AND ESTATE OF HELEN C. GOULD, DE-
CEASED, THEODORE B. GOULD, EXECUTOR,[1] PETITIONERS *v*.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos.   5887–07L, 4592–08,   Filed November 26, 2012.
11606–10L.

In 1984, P–H and several entities in which he owned interests filed voluntary petitions in ch. 11 bankruptcy. The bankruptcy court established a liquidating trust to which all assets of the bankruptcy estates were transferred. The liquidating trustee remitted payments to the Internal Revenue Service (IRS) in satisfaction of the income tax liabilities of the debtors, including P–H's bankruptcy estate, for tax years before those at issue herein. On Ps' individual joint 1995, amended 1995, and 1996–2002 Federal income tax returns, Ps reported net operating loss (NOL) deductions and estimated tax payments belonging to the liquidating trust and one of the debtor entities, arguing with respect to the trust that they are so entitled because P–H is the grantor of the liquidating trust pursuant to I.R.C. secs. 671–677. On each of their 1995–2002 tax returns, Ps also claimed capital loss deductions. In addition, they reported, on their joint 1995, amended 1995, and each of their 1996–2003 and 2005–07 tax returns, a self-employment tax liability but did not remit payment. R determined deficiencies in Ps' 1995–2002 income tax and imposed fraud penalties under I.R.C. sec. 6663(a). The three-year period of limitations on assessment under I.R.C. sec. 6501(a) had expired for 1995–2001 before R issued the notice of deficiency. R alleges that the notice was timely issued as to those years because Ps filed false or fraudulent returns. *See* I.R.C. sec. 6501(c). For 2002, for which the period of limitations on assessment remained open, R alleges that P–H is liable for the I.R.C. sec. 6663(a) civil fraud penalty, or alternatively, that Ps are liable for the I.R.C. sec. 6662(a) accuracy-related penalty. R determined to proceed by levy to collect Ps' 1995, 1999–2003, and 2005–07 self-employment tax liabilities and

[1] These cases have been consolidated for purposes of opinion. Docket Nos. 5887–07L and 4592–08 were consolidated for purposes of trial, briefing, and opinion. Docket No. 11606–10L, which was submitted fully stipulated, proceeded separately for purposes of hearing and briefing. We subsequently consolidated that case with docket Nos. 5887–07L and 4592–08 for purposes of this Opinion.

418

filed a notice of Federal tax lien with respect to those liabilities for 2000–2003 and 2005–07. Ps filed petitions for review of the determination pursuant to I.R.C. sec. 6330.

1. *Held*: For all audit years, P–H is not the grantor of the liquidating trust; the trust was not created and funded gratuitously on P–H's behalf; he did not acquire an interest in the trust from his bankruptcy estate upon its termination; nor is he the owner because trust income was used to discharge his indebtedness.

2. *Held*, *further*, for 1995–2002, Ps are not entitled to NOL deductions attributable to either P–H's bankruptcy estate or the liquidating trust.

3. *Held*, *further*, for 1995–2002, for failure to substantiate, Ps are not entitled to capital loss deductions.

4. *Held*, *further*, Ps' 1995–2002 returns were not fraudulent.

5. *Held*, *further*, because those returns were not fraudulent, R's determinations and adjustments regarding 1995–2001 are barred.

6. *Held*, *further*, because the liquidating trust is not a grantor trust with respect to P–H, Ps are not entitled to credit or refund of claimed overpayments of tax on income attributable to property held by the trust.

7. *Held*, *further*, this Court lacks jurisdiction to determine whether R properly abated assessments of income tax against the liquidating trust for tax years 1997 and 1998.

8. *Held*, *further*, Ps are liable for the I.R.C. sec. 6662(a) accuracy-related penalty for 2002.

9. *Held*, *further*, Ps' claims to credits against their 1995, 1999–2003, and 2005–07 self-employment tax liabilities are time barred.

10. *Held*, *further*, R did not abuse his discretion in denying Ps a face-to-face collection due process hearing for 2000–2003 and 2005–07.

*Samuel Charles Ullman* and *W. Patrick Hancock*, for petitioners in docket Nos. 5887–07L and 4592–08.

Theodore B. Gould, pro se and for the Estate of Helen C. Gould in docket No. 11606–10L.

*William John Gregg* and *Erin R. Hines*, for respondent in docket Nos. 5887–07L and 4592–08.

*William John Gregg*, for respondent in docket No. 11606–10L.

## CONTENTS

FINDINGS OF FACT ............................................................................ 423
OPINION ............................................................................................. 431
I.   Deficiency Proceeding Regarding Petitioners' 1995–2002 Tax
     Liabilities ...................................................................................... 431
  A.   Period of Limitations .................................................................. 431
    1.   Introduction ........................................................................... 431
    2.   Underpayment of Tax ............................................................ 431
      a.  NOL Carryovers .................................................................. 432
        (1)  The MCLT Is Not a Grantor Trust ................................. 432
          (a)  Collateral Estoppel ..................................................... 433
          (b)  Grantor Trust Rules ................................................... 435
        (2)  Petitioners Are Not Entitled to NOL Carryovers of
             Petitioner's Bankruptcy Estate Upon Its Termina-
             tion ........................................................................... 440
      b.  Capital Loss Deductions ...................................................... 443
      c.  Conclusion .......................................................................... 445
    3.   Fraudulent Intent ................................................................. 446
      a.  Understatement of Income .................................................. 446
      b.  Inadequate Maintenance of Records .................................... 447
      c.  Failure To Cooperate With Tax Authorities ........................ 448
      d.  Intent To Mislead .............................................................. 448
      e.  Filing False Documents ....................................................... 449
      f.  Implausible or Inconsistent Explanations of Behavior ....... 450
      g.  Conclusion .......................................................................... 452
  B.   Deficiencies in Tax .................................................................... 453
    1.   Introduction ........................................................................... 453
    2.   Disallowed Deductions ........................................................... 453
    3.   Credit or Refund of Overpayment of Tax .............................. 453
    4.   Abatement of Assessments .................................................... 455
  C.    Imposition of the Accuracy-Related Penalty .......................... 456
    1.   Introduction ........................................................................... 456
    2.   Substantial Understatement of Income Tax .......................... 456
    3.   Section 6664(c) Reasonable Cause Defense ........................... 459
    4.   Conclusion ............................................................................. 462

II.  Collection Proceeding Regarding Petitioners' 1995, 1999–2003,
     and 2005–07 Tax Liabilities ....................................................... 462

III.  Conclusion ..................................................................................... 466

APPENDIX ......................................................................................... 467

HALPERN, *Judge*: By a notice of deficiency, respondent determined deficiencies in, and penalties with respect to, Theodore B. Gould and Helen C. Gould's (petitioners'[2]) Federal income tax as follows:[3]

| Year | Deficiency | Penalty sec. 6663(a) |
|------|-----------|----------------------|
| 1995 | $41,218 | $30,914 |
| 1996 | 8,934 | 6,701 |
| 1997 | 4,293 | 3,220 |
| 1998 | 5,246 | 3,935 |
| 1999 | 19,155 | 14,366 |
| 2000 | 113,064 | 84,798 |
| 2001 | 23,679 | 17,759 |
| 2002 | 27,732 | 20,799 |

On brief, respondent concedes an adjustment made in the notice of deficiency to petitioners' 1995 taxable income for an unreported $12,750 State income tax refund. His concession reduces the deficiency and penalty amounts for that year to $36,628 and $27,471, respectively.

By two Notices of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, respondent's Appeals Office (Appeals) sustained a proposed levy to collect petitioners' assessed but unpaid self-employment taxes, penalties, and interest for 1995, 1996, and 1999. We subsequently dismissed the levy action as to 1996 as moot.[4] By a third Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330, Appeals sustained (1) the filing of a notice of Federal tax lien relating to petitioners' assessed but unpaid self-employment taxes for 2000, 2001, 2002, 2003, 2005, 2006, and 2007 and (2) a proposed levy to collect petitioners' assessed but unpaid self-employment taxes, penalties, and interest for those years.

After respondent's concession that Mrs. Gould is not liable for the section 6663(a) civil fraud penalty, the issues for deci-

---

[2] Mrs. Gould died after the first of these consolidated cases commenced. For convenience, we use the term "petitioners" to refer to Mr. and Mrs. Gould, and we use the term "petitioner" sometimes to refer to Theodore B. Gould (Mr. Gould).

[3] Unless otherwise stated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all amounts to the nearest dollar.

[4] We did so on the basis of respondent's representation that, because of offsets of overpayments from other taxable years, no outstanding assessed liability and no unassessed accrued liability exist for 1996 and he will take no further collection action for that year.

sion are: (1) whether the periods of limitations for assessing and collecting the proposed deficiencies and penalties remain open as to taxable years 1995–2001,[5] and if so, whether (2) petitioners are entitled to a net operating loss NOL deduction for each of those years, (3) petitioners are entitled to a capital loss deduction for each of those years, (4) petitioners are entitled to a credit or a refund of an alleged overpayment for each of those years, (5) respondent properly abated certain tax assessments,[6] and (6) Mr. Gould is liable for the civil fraud penalty pursuant to section 6663(a) for each of those years. Because we decide for petitioners with respect to issue (1), respondent is time barred from raising issues (2) through (6) as to 1995–2001, and we must decide those issues in petitioners' favor.

Respondent has also raised issues (2) through (6) as to taxable year 2002, for which, because of petitioners' consent to extend the period of limitations, respondent may still assess and collect tax. We must, therefore, decide issues (2) through (6) for that year. If we determine that Mr. Gould is not liable for the section 6663(a) penalty for that year, we must determine whether petitioners are liable for the section 6662(a) accuracy-related penalty.[7]

Finally, we decide whether (1) to sustain the filing of the notice of Federal tax lien relating to petitioners' assessed 2000–2003 and 2005–07 self-employment taxes, (2) respondent may proceed by levy to collect petitioners' 1995, 1999–2003, and 2005–07 assessed self-employment tax liabilities, penalties, and interest, and (3) respondent's Appeals Office improperly denied petitioners' request for a face-to-face collection due process hearing for tax years 2000–2003 and 2005–07.

---

[5] The general three-year limitations period on assessments provided by sec. 6501(a) had expired for taxable years 1995–2001 by November 30, 2007, the notice of deficiency's date of issuance. The notice of deficiency was timely for 2002 because petitioners had consented to extend the limitations period for that year.

[6] Petitioners did not by pleading or motion raise that issue. *See* Rules 34(b)(4), 37(b); *Estate of Mandels v. Commissioner*, 64 T.C. 61, 73 (1975) (this Court ordinarily will not consider issues that have not been pleaded). Respondent has not objected to petitioners' attempt to try this issue, and both parties address the issue in their opening and answering briefs. Accordingly, we treat petitioners' claim as having been tried by consent of the parties and thus raised by the pleadings. *See* Rule 41(b).

[7] There are also certain computational adjustments that follow from the adjustments at issue, but they are not in controversy, and we need not address them.

## FINDINGS OF FACT

These cases involve principally questions of law, not of fact. We set forth the facts below in order to frame those questions at issue herein.

### Background

Mr. and Mrs. Gould were married during 1995–2003 and 2005–07 (years in issue). At the time they filed the petitions, petitioners lived in Virginia. [8] Mr. Gould graduated from Oxford University with a master of arts degree in economics.

Petitioner formed, and held interests in, the following entities: Holywell Corp. (Holywell), the Miami Center Corp. (MCC), the Miami Center Limited Partnership (MCLP), Chopin Associates (Chopin), and the Miami Center Joint Venture (MCJV), [9] a Florida general partnership. We have attached hereto as an appendix a diagram indicating, as of January 1, 1983, the relationships between petitioner and the above-mentioned entities.

### Bankruptcy Proceeding and the Miami Center Liquidating Trust

Chopin and MCLP borrowed money from the Bank of New York (BNY) to develop the Miami Center, a hotel and office building complex to be built in Miami, Florida. They defaulted on the loans, and on August 22, 1984, petitioner, Holywell, MCC, MCLP, and Chopin (sometimes debtors) filed separate petitions in bankruptcy with the U.S. Bankruptcy Court for the Southern District of Florida (bankruptcy court). The bankruptcy petitions were filed pursuant to chapter 11 of the Bankruptcy Code, and the debtors represented their own bankruptcy estates as debtors in possession. [10]

On August 8, 1985, the bankruptcy court confirmed an amended consolidated plan of reorganization (plan). The plan provided, among other things, for the substantive consolidation of the debtors' bankruptcy estates and for the formation

[8] Mrs. Gould died before the filing of the petition in docket No. 11606–10L. Mr. Gould, as executor of Mrs. Gould's estate, resided in Virginia when he filed the petition in that proceeding.

[9] Petitioner formed MCJV with Olympia & York Florida Equity Corp., a Florida corporation, with each holding a 50% interest in MCJV.

[10] A debtor who takes on the role of a "debtor in possession" administers the estate's property including the retention of possession and control of its business through the bankruptcy estate. 11 U.S.C. sec. 1101(1) (2006).

of a liquidating trust, the Miami Center Liquidating Trust (MCLT), to which all assets of those estates would be transferred. The assets included, primarily, the Miami Center and the Washington proceeds.[11] The plan provided that, on its effective date, "all right, title and interest of the Debtors in and to the Trust property, including Miami Center, shall vest in the Trustee" and the trustee shall liquidate and distribute all trust property to the bankruptcy estates' creditors. The plan also provided that, after the payment or resolution of all creditor claims, all remaining MCLT assets would revert to the debtors. The plan was silent as to the trustee's obligation to file Federal or State tax returns or to pay Federal and State income taxes on income attributable to the property it had received.

On August 12, 1985, the bankruptcy court appointed as liquidating trustee Fred Stanton Smith (Mr. Smith or trustee). On October 10, 1985, the effective date of the plan, all assets of the debtors' bankruptcy estates were transferred to the MCLT, and Mr. Smith sold the Miami Center to BNY's nominee. Mr. Smith did not establish a reserve from which to pay taxes due on the sale of the Miami Center.

*Federal Tax Returns and Tax Liabilities*

Holywell (the common parent of an affiliated group of corporations) made a consolidated return of income for its fiscal year ended July 31, 1985, and it asked Mr. Smith to pay the income tax due on the gain from the sale of the Washington properties. Holywell did not make a return of income for its fiscal year ended July 31, 1986; income for that year included gain from the sale of the Miami Center. On December 28, 1987, Mr. Smith brought suit in the bankruptcy court against the U.S. Government, BNY,[12] and the debtors for a declaration of his (the trustee's) obligation to file Federal tax returns for the debtors (for petitioner, his bankruptcy estate) and to pay income taxes due.

---

[11] The Washington proceeds totaled $32,422,799 and resulted from a sale, which closed in December 1984, of real and personal property (Washington properties) held by entities not party to the bankruptcy proceeding but in which petitioner (directly or indirectly) held interests. *See Smith v. United States (In re Holywell Corp.)*, 85 B.R. 898 (Bankr. S.D. Fla. 1988), *aff'd*, 911 F.2d 1539 (11th Cir. 1990), *rev'd*, 503 U.S. 47 (1992).

[12] Mr. Smith brought suit against BNY because he contended that, if the MCLT is liable to pay taxes due on the sale of the Washington properties and the Miami Center, then BNY should be held responsible for all such payment.

The bankruptcy court held that Mr. Smith was not responsible to file Federal income tax returns or to pay taxes owing. *Smith v. United States (In re Holywell Corp.)*, 85 B.R. 898, 902 (Bankr. S.D. Fla. 1988), *aff'd*, 911 F.2d 1539 (11th Cir. 1990), *rev'd*, 503 U.S. 47 (1992). On appeal, however, the U.S. Supreme Court held that Mr. Smith had to file tax returns and pay taxes due on income attributable to the property the MCLT had received from the debtors' estates. *Holywell Corp.*, 503 U.S. at 54–55. With respect to what the Court described as the corporate debtors, it held that the trustee was responsible to make income tax returns as assignee of the those debtors under section 6012(b)(3). *Id.* at 53. With respect to petitioner's bankruptcy estate, the Court determined that, upon confirmation of the plan, a newly separate and distinct trust (the MCLT) was created and all of the assets of petitioner's bankruptcy estate were vested in the trustee. Because Mr. Smith was a fiduciary of the trust, which held the property of petitioner's bankruptcy estate, Mr. Smith (as trustee) was responsible for paying the taxes on income attributable to the property and was also required to file Federal income tax returns. *Id.* at 54. The case was eventually remanded to the bankruptcy court to determine the amounts of the tax liabilities of the corporate debtors, petitioner's bankruptcy estate, and the MCLT (taxpayers).

Notwithstanding the Supreme Court's ruling, Mr. Smith did not file timely Federal tax returns for the taxpayers. As a result, respondent began an examination of each of the taxpayer's liabilities for the relevant years. One of respondent's revenue agents issued separate revenue agent's reports (RAR) with respect to Holywell and subsidiaries (for fiscal years ended July 31, 1986–91), the MCLT (for taxable years 1985–91), and petitioner's bankruptcy estate. The RAR with respect to petitioner's bankruptcy estate, which related to taxable years ending December 31, 1984, and October 10, 1985, stated, among other things: "There is no carryover to the debtor of any net operating loss from the [bankruptcy] estate."

*Payments Remitted to IRS*

In early 1992, Mr. Smith made payments of $2,920,000 and $80,000 to the IRS on behalf of the MCLT. On April 16,

1992, respondent credited $2,176,636 of the $2,920,000 payment to the MCLT's 1991 Federal income tax liability. The excess payment (i.e., $743,364) was treated as an overpayment of tax for the MCLT's 1991 tax year. That amount, in addition to the $80,000, which was posted to the MCLT's 1992 account, was credited to an "excess collection account". [13] Although the record is silent as to when and on behalf of which taxpayer, Mr. Smith made additional payments to the IRS totaling $3,327,229.

*Joint Motion and Payments Made Thereunder*

On September 30, 1993, over petitioner's objections, the bankruptcy court by order approved a Joint Motion for Approval of Compromise of Tax Liabilities Asserted by United States of America (joint motion) filed by the U.S. Department of Justice and Mr. Smith. The joint motion sought the bankruptcy court's approval of a compromise and settlement of the tax liabilities, addressed in the above-mentioned RARs, of Holywell and its subsidiaries, the MCLT, and petitioner's bankruptcy estate. In relevant part, the joint motion stated that the asserted income tax liabilities would be settled on the basis of, among other things: (1) a payment of $10 million (in addition to the previous payment of approximately $3,327,229) by the trustee to the United States, and (2) that "there shall be no tax attribute carryovers available to * * * the bankruptcy estate of Theodore B. Gould as of October 10, 1985". The joint motion did not identify the accounts or taxable years to which the payments by Mr. Smith would be allocated.

In accordance with the joint motion, on October 12, 1993, Mr. Smith remitted a $10 million payment to the IRS; the IRS credited the payment against Holywell's Federal income tax liability for fiscal year ended July 31, 1986.

On September 9, 1998, the bankruptcy court entered a final decree terminating the MCLT and closing the bankruptcy case as to each debtor.

---

[13] An excess collection file is a file within the IRS' computer system identifying nonrevenue receipts (payments received for items other than taxes), which cannot be identified or applied to their proper account. If the item is not later credited to its proper account, the file will contain excess collections and revenue clearance accountability data for up to seven years from the date of the payment to the excess collection file. Internal Revenue Manual pt. 3.17.220.1.8(1) (Jan. 1, 2012).

*Petitioners' Joint Federal Income Tax Returns*

Edgar Schumacher, a certified public accountant, prepared petitioners' 1991–94 joint Forms 1040, U.S. Individual Income Tax Return. Mr. Schumacher also prepared financial information for MCJV, MCLP, and Chopin, from which the entities' Schedules K–1, Shareholder's Share of Income, Credits, Deductions, etc., were prepared; petitioners' 1991–94 Forms 1040 were prepared from those Schedules K–1.

Mr. Gould prepared petitioners' 1995 joint Form 1040, amended 1995 joint Form 1040, and 1996, 1997, and 1999–2002 joint Forms 1040.[14] Petitioners paid their attorney, Robert Musselman, to review the 1995–99 joint Forms 1040 before their filing. Mr. Musselman did not sign the Forms 1040 as a paid preparer.[15]

On their 1995–2002 Forms 1040, petitioners reported tax liabilities and claimed NOL deductions, capital losses, and estimated tax payments as follows:[16]

| Year | Tax liability | NOL | Capital loss | Estimated tax payments |
|------|---------------|-----|--------------|------------------------|
| 1995 | $17,133 | $80,498 | $3,000 | -0- |
| 1995 (amended) | 12,247 | 188,305 | 3,000 | $3,103,406 |
| 1996 | 9,747 | 75,355 | 5,125 | 3,091,159 |
| 1997 | 5,478 | 39,848 | 18,964 | 91,159 |
| 1998 | 8,433 | 63,002 | 3,000 | 3,299,528 |
| 1999 | 11,450 | 97,478 | 17,939 | 26,162,136 |
| 2000 | 18,463 | 351,331 | 3,000 | 26,154,983 |
| 2001 | 11,956 | 105,822 | 4,305 | 44,823,979 |
| 2002 | 13,353 | 121,885 | 3,000 | 44,812,023 |

The claimed NOLs relate to (1) NOLs of petitioner's bankruptcy estate, to which petitioner believes he succeeded upon the termination of his bankruptcy estate, pursuant to section 1398(i), and (2) losses attributable to petitioner's alleged distributive share of losses from property held by the MCLT, including MCJV, between 1985 and 1991, and losses not connected with the MCLT. Although petitioners deducted on their 1995–2002 Forms 1040 Mr. Gould's alleged shares of MCJV's losses, they failed to report his share of MCJV's income generated during those years.

---

[14] It is not clear whether Mr. Gould prepared petitioners' 1998 joint Form 1040 but, in honor of consistency, we assume that he did.

[15] The record is silent as to whether Mr. Gould prepared petitioners' 2003 joint Form 1040 and 2005–07 joint Forms 1040. Moreover, those returns are not in evidence.

[16] We do not include petitioners' 2003 and 2005–07 joint Forms 1040 because those returns are not in evidence.

Petitioners did not remit any of the estimated tax payments reported on their joint 1995–2002 Forms 1040. Moreover, respondent's records, the Forms 4340, Certificate of Assessments, Payments and Other Specified Matters, for petitioners' 1995–2002 taxable years, reflect no estimated tax payments.

Petitioners reported self-employment tax liabilities on the 1995 joint Form 1040, amended 1995 joint Form 1040, and 1996–2003 and 2005–07 joint Forms 1040 but did not pay those amounts.

Respondent assessed the self-reported tax liabilities, including penalties and interest, for those years.

*MCLT's 1997 and 1998 Federal Tax Returns*

In 2000 and 2001, petitioner filed amended Forms 1041, U.S. Income Tax Return for Estates and Trusts, for the MCLT's: (1) taxable year ended December 31, 1997, reporting a tax liability of $22,871,041, and (2) short taxable year ended October 26, 1998, reporting a tax liability of $8,672,291. Respondent assessed the amounts reported. Although these amounts were not paid, petitioners reported those assessments on their joint tax returns as estimated tax payments. Respondent later abated the assessments.

*Levy Notices for 1995, 1996, and 1999*

Respondent issued to petitioners a Final Notice—Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice), dated April 1, 2002, informing them that he intended to collect by levy petitioners' assessed but unpaid 1999 self-employment taxes, penalties, and interest. Respondent issued a second levy notice (collectively, levy notices), dated July 1, 2002, informing petitioners of his intent to collect by levy petitioners' assessed but unpaid 1995 and 1996 self-employment taxes, penalties, and interest.

*Collection Due Process (CDP) Hearing and Notices of Determination for 1995, 1996, and 1999*

In response to each levy notice, petitioners timely submitted a Form 12153, Request for a Collection Due Process or Equivalent Hearing (hearing requests). In the hearing request regarding tax year 1999, petitioners raised the ques-

tion of their underlying liability, contending that no tax is due because Mr. Smith "paid $13,347,000 in taxes as 'the fiduciary of trust of an individual', which must be credtied [sic] to the taxpayer's account as the beneficial owner of the property transferred to Miami Center Liquidating Trust and its sole beneficiary." Petitioners made a similar argument in the hearing request regarding tax years 1995 and 1996, except that they asserted that Mr. Smith "paid taxes exceeding $13,361,000". Petitioners proposed no collection alternatives in either hearing request.

Appeals Officer David Reilly was assigned the hearing requests. He determined that petitioners' arguments were groundless because Appeals had concluded in a previous hearing relating to petitioners' 1997 tax liability that there exists "no legal theory under which * * * [petitioner] may be the grantor and beneficiary of the Miami Center Liquidating Trust." Appeals Officer Reilly, therefore, determined that petitioners were not eligible for a face-to-face CDP hearing. Petitioners' CDP hearing was ultimately conducted by correspondence. Subsequently, Appeals issued the notices of determination sustaining in full the levy notices.

Petitioners assign error to the notices of determination, claiming that they are "contrary to the Supreme Court's opinion, cited as *Holywell Corp., et al. v. Smith*, 503 U.S. 47 (1992), the provisions of the Internal Revenue Code, the regulations and rulings promulgated thereunder concerning liquidating trusts, and barred by the doctrine of collateral estoppel."

*Notice of Deficiency*

In support of the deficiencies in tax he determined, respondent made adjustments to petitioners' income disallowing, among other things, for lack of substantiation, NOL deductions and capital loss carryovers claimed on petitioners' joint 1995–2002 Forms 1040. Respondent also determined a civil fraud penalty under section 6663(a) for each of those years, or alternatively, for 2002, a section 6662(a) accuracy-related penalty attributable to a substantial understatement of income tax or negligence. Petitioners assign error to those determinations.

*Levy Notices and Lien Notice for 2000–2003 and 2005–07*

After petitioners had filed petitions with this Court for tax years 1995–2002, respondent issued petitioners each a separate levy notice, dated December 7, 2009, informing them that he intended to collect by levy their assessed but unpaid 2000–2003 and 2005–07 self-employment taxes, penalties, and interest. Respondent also issued to petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320 (lien notice), dated December 26, 2009, informing them that he had filed, on December 14, 2009, a notice of Federal tax lien relating to their assessed self-employment taxes for those years.

*CDP Hearing and Notice of Determination for 2000–2003 and 2005–07*

In response to the levy notices and the lien notice for 2000–2003 and 2005–07, petitioners timely submitted Forms 12153 (collectively, levy and lien hearing requests) in which they raised the question of their underlying liabilities, contending that "no taxes are due" and that the lien should be withdrawn for the same reasons as stated in the hearing requests relating to 1995, 1996, and 1999. Petitioners proposed no collection alternatives in either hearing request relating to 2000–2003 and 2005–07.

Settlement Officer D.W. DeVincentz was assigned the lien and levy hearing requests and scheduled with petitioner a telephone CDP hearing. During a telephone call with petitioner before the scheduled CDP hearing, Settlement Officer DeVincentz offered him a face-to-face CDP hearing at certain locations, but petitioner rejected those locations. Appeals issued a notice of determination sustaining in full the notice of Federal tax lien and the notice of intent to levy for 2000–2003 and 2005–07, stating that petitioners offered no collection alternatives and "could not dispute [their] liability" because "This issue has been repeatedly challenged by the taxpayer and ruled against him."

Petitioners assign error to the notice of determination for years 2000–2003 and 2005–07, claiming that "the issuance of the respondent's Determination, without a CDP Hearing, denying without citation, that the trustee's overpayment of approximately $13,361,000 as a fiduciary, acting on the Tax-

payer's behalf, were available as credits to the Taxpayer's account, was an abuse of discretion".

OPINION

I. *Deficiency Proceeding Regarding Petitioners' 1995–2002 Tax Liabilities*

A. *Period of Limitations*

1. *Introduction*

A deficiency in tax generally must be assessed within three years of the date on which the return was filed. *See* sec. 6501(a). If a taxpayer files "a false or fraudulent return with the intent to evade tax," however, the tax may be assessed at any time. Sec. 6501(c)(1). The parties agree that, unless petitioners' returns for 1995–2001 were made falsely or fraudulently with the intent to evade tax, the period of limitations on assessment and collection of petitioners' income tax for those years has expired. [17]

Respondent bears the burden of proving an exception to the general limitations period, *see, e.g.*, *Harlan v. Commissioner*, 116 T.C. 31, 39 (2001), and his burden here is the same as his burden under section 6663 to prove applicability of the civil fraud penalty (which is also at issue), *see, e.g.*, *Browning v. Commissioner*, T.C. Memo. 2011–261. Respondent must establish by clear and convincing evidence that petitioners filed false and fraudulent returns with the intent to evade tax. Rule 142(b); *see* sec. 7454(a). To do so, respondent must establish by that standard both that (1) petitioners underpaid their income tax for 1995–2002 and (2) at least some portion of each such underpayment was due to fraud. *E.g.*, *DiLeo v. Commissioner*, 96 T.C. 858, 873 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992).

2. *Underpayment of Tax*

Respondent argues that petitioners underpaid their 1995–2002 income tax because of overstated NOL and capital loss carryover deductions claimed on their tax returns for those years. Petitioners argue that they are entitled to the claimed deductions because (1) the MCLT was a grantor trust and

---

[17] As stated *supra* note 5, the period of limitations remains open for assessment as to 2002.

petitioner was its grantor or substantial owner pursuant to sections 671–677, such that he is entitled to the NOLs of the trust, (2) petitioner succeeded to his bankruptcy estate's tax attributes, including its NOLs, for tax year 1985, [18] and (3) petitioner incurred capital losses in 1991 from his investment in TBG Associates, Ltd., which he carried over to subsequent taxable years.

a. *NOL Carryovers*

Section 172 provides for an NOL deduction. Section 172(c) defines an NOL as the excess of the deductions allowed over the gross income. In general, an NOL for any taxable year may be carried back to each of the three taxable years preceding the taxable year of the loss and carried over to each of the 15 taxable years following the taxable year of the loss. Sec. 172(b)(1)(A).

On petitioners' amended joint 1995 Form 1040 and joint 1996–2002 Forms 1040, petitioners reported NOL deductions of $188,305, $75,355, $39,848, $63,002, $97,478, $351,331, $105,822, and $121,885, respectively. The NOL carryovers consist of losses of Holywell, MCC, MCLP, Chopin, and MCJV. The parties do not dispute the amounts of those losses reported on petitioners' tax returns, merely petitioners' entitlement to deduct those losses.

(1) *The MCLT Is Not a Grantor Trust*.

Petitioners argue that they are entitled to NOLs of the MCLT because the trust was a grantor trust and petitioner its grantor or substantial owner pursuant to sections 671–677. As discussed *supra*, Mr. Smith brought suit in the bankruptcy court against the U.S. Government, BNY, and the debtors for a declaration of the MCLT's responsibility to file returns and pay Federal income taxes due. The bankruptcy court found Mr. Smith, as trustee, not liable for payment of

---

[18] At trial, respondent raised the issue of whether petitioner or petitioner's bankruptcy estate was the partner entitled to a distributive share of losses from MCLP, Chopin, and MCJV between 1985 and 1991. We asked the parties to address on brief whether petitioner's status as a partner involved a partnership item necessitating a partnership-level proceeding pursuant to the unified audit and litigation procedures enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97–248, sec. 402(a), 96 Stat. at 648. Although the parties addressed that issue on brief, petitioners do not rely on petitioner's partner status as the reason for their entitlement to the partnerships' NOLs. Therefore, resolution of the jurisdictional issue is unnecessary, and we do not address it.

Federal income taxes because the MCLT was a grantor trust (the debtors being its grantors pursuant to section 677(a)); as a grantor trust, it was not a taxable entity for Federal income tax purposes. *Smith*, 85 B.R. at 901–902. On the basis of that finding, petitioners argue that respondent is both collaterally estopped[19] and barred by res judicata[20] from now arguing that the MCLT was not a grantor trust.

(a) *Collateral Estoppel*

In *Ron Lykins, Inc. v. Commissioner*, 133 T.C. 87, 101 (2009), we stated:

The rule of collateral estoppel provides that "[w]hen an issue of fact or law is *actually litigated* and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or different claim." 1 Restatement, Judgments 2d, sec. 27 (1982) (emphasis added); see also *Montana v. United States*, 440 U.S. 147, 153–154 (1979). * * *

The following conditions must be satisfied for collateral estoppel to apply to an issue:

(1) the issue to be decided in the second case must be identical in all respects to the issue decided in the first case, (2) a court of competent jurisdiction must have rendered a final judgment in the first case, (3) a party may invoke the doctrine only against parties to the first case or

---

[19] Petitioners also assert that respondent is collaterally estopped from arguing that the MCLT was not a liquidating trust. We need not address that claim because respondent agrees that it was a liquidating trust. Furthermore, with regard to the lien and levy issue for years 2000–2003 and 2005–07, petitioners have raised arguments regarding collateral estoppel that were not raised in docket Nos. 5887–07L and 4592–08, including that respondent is collaterally estopped from arguing that petitioner's bankruptcy estate did not terminate on October 10, 1985. Because we determine *infra* that the MCLT is not a grantor trust as to petitioner and because the parties anchor their arguments to October 10, 1985, as the termination date of petitioner's bankruptcy estate, *see infra* note 29, those arguments are without force and we do not discuss them.

[20] Petitioners argue that respondent is barred by res judicata from making several arguments, including that the MCLT was not a grantor trust because "the question was an admissible matter that the respondent could have offered [before the U.S. Supreme Court], and did not, to defeat the Eleventh Circuit's conclusion that the petitioner as 'the reorganized debtor, not the liquidating trustee[,] is responsible for such taxes'". They also argue that res judicata binds respondent as to the bankruptcy court's amended order. We do not understand petitioners' second argument; in any event, res judicata does not apply in these cases. One of the elements of res judicata, an identity of the cause of action in the earlier and later suits, *Frank Sawyer Trust of May 1992 v. Commissioner*, 133 T.C. 60, 71–72 (2009), is not present in these proceedings. The issue in the earlier suit was Mr. Smith's obligation to file tax returns and pay taxes due on behalf of the corporate debtors and petitioner's bankruptcy estate for tax years 1985–91. The issue before us involves petitioners' tax liabilities for tax years 1995–2003 and 2005–07. The causes of action are different and, accordingly, the principles of res judicata do not apply in the instant proceedings. We do not further address petitioners' argument.

those in privity with them, (4) the parties must have actually litigated the issue and the resolution of the issue must have been essential to the prior decision, and (5) the controlling facts and legal principles must remain unchanged. * * * [*Hi-Q Personnel, Inc. v. Commissioner*, 132 T.C. 279, 289 (2009).]

Respondent argues that the five conditions necessary for him to be collaterally estopped from denying that the MCLT is not a grantor trust have not been satisfied in these cases. More fundamentally, however, he argues, and we agree, that collateral estoppel does not apply to a trial court's conclusions of law or findings of fact where its judgment is vacated, reversed, or set aside by an appellate court. *Hudson v. Commissioner*, 100 T.C. 590, 593 (1993). The bankruptcy court's judgment was affirmed by the District Court for the Southern District of Florida, whose judgment was later affirmed by the Court of Appeals for the Eleventh Circuit. The U.S. Supreme Court, however, reversed the judgment of the Court of Appeals for the Eleventh Circuit. *Holywell Corp.*, 503 U.S. 47. With respect to the Supreme Court's reversal of the Court of Appeals, petitioners argue that the bankruptcy court's holding that the MCLT was a grantor trust survived that reversal. They assert that the Court did not address whether the MCLT was a grantor trust and that the Court "did not overrule the Bankruptcy Court with respect to its finding * * *, the Supreme Court merely said that Petitioner is not a 'grantor' in the classic sense of the term."

Petitioners are wrong. The Court effectively reversed the bankruptcy court's finding as it pertained to petitioner. The Court stated that it "fail[ed] to see how the respondents can characterize him [petitioner] as the grantor" under section 1.677(a)–1(d), Income Tax Regs., which implements section 677(a), the same provision under which the bankruptcy court found the debtors, including petitioner, to be grantors of the trust. *Id.* at 57. The Court found that petitioner had contributed nothing to the MCLT. *Id.* With respect to the property received from petitioner's bankruptcy estate, the Court treated the MCLT as a trust for which the fiduciary, Mr. Smith, had to make a return. *Id.* at 54. Whether the Court's opinion preserved the bankruptcy court's finding that the MCLT was a grantor trust to the extent of the other debtors' interests has no bearing on its reversal of the bankruptcy court's finding as it pertains to petitioner.

Petitioners cannot, as a basis for collateral estoppel, rely on the bankruptcy court's findings that the MCLT was a grantor trust since its finding, in that respect, did not survive the Supreme Court's reversal of the Court of Appeals.[21]

(b) *Grantor Trust Rules*

Section 671 provides that, where the grantor or another person is treated as the owner of any portion of a trust, he shall compute his taxable income and credits by taking into account "those items of income, deductions, and credits against tax of the trust which are attributable to that portion of the trust". A grantor or another person is treated as the owner of a portion of a trust upon satisfaction of any one of five conditions enumerated in sections 673–678. If the grantor is so treated, the trust is a grantor trust as to him and is not treated as a separate taxable entity for Federal income tax purposes to the extent of the grantor's retained interest. *See* sec. 1.671–2(b), Income Tax Regs. The grantor, therefore, must report his portion of the trust's income and deductions on his personal Federal income tax return. *Id.*

Petitioners contend that Mr. Gould is entitled to claim on each of his 1995–2002 Forms 1040 an NOL deduction, consisting of NOL carryovers from 1985–91, because the MCLT constituted a grantor trust pursuant to the provisions of sections 671–677 from 1985–91 and is thus to be disregarded as a separate taxable entity to the extent of the grantor's retained interest. Although their briefs are unclear, we understand petitioners to support their contention with the following assertions: (1) Petitioner is the grantor[22] of the

---

[21] Apparently on the basis that he cannot show satisfaction of the five preconditions for collateral estoppel, respondent does not argue that, because the Supreme Court reversed the bankruptcy court's ruling that petitioner contributed property to the MCLT and was a grantor with respect thereto, petitioners are collaterally estopped from arguing petitioner's grantor status with respect to the MCLT.

[22] At trial, petitioner conceded that he was not the grantor of the MCLT but instead its substantial owner under sec. 678. On brief, petitioners failed to address the substantial owner argument, and we consider it to be abandoned. *See Mendes v. Commissioner*, 121 T.C. 308, 312–313 (2003) ("If an argument is not pursued on brief, we may conclude that it has been abandoned."). Despite petitioner's concession at trial, he argues on brief that he is grantor of the MCLT with respect to the entire portion of trust income. Considering petitioner's pro se status at trial and his subsequent retention of counsel in docket Nos. 5887–07L and 4592–08, we reject his concession and rely on his arguments made on brief.

We note that, in docket No. 11606–10L, on brief, petitioners argue that petitioner "must be deemed the person referred to as the 'substantial owner' in section 671". On the basis of the arguments following that contention, we believe that petitioners use the term "substantial

Continued

MCLT with respect to the entire portion of trust income under section 1.671–2(e)(1), Income Tax Regs., because the trust was created and funded gratuitously on his behalf, or, alternatively, under section 1.671–2(e)(3), Income Tax Regs., because he acquired an interest in the trust from his bankruptcy estate upon its termination, and (2) petitioner is the owner of the entire portion of trust income under section 1.677(a)–1(d), Income Tax Regs., because the trust income was used to discharge his debt.[23] Petitioners conclude that they are, therefore, entitled to report on their 1995–2002 personal tax returns NOL carryovers attributable to the trust's 1985–91 NOLs. They argue that petitioner is grantor and owner of the entire portion of the trust income because, through his stock ownership and partnership interests, he owned in its entirety the MCLP, Chopin, MCC, and Holywell assets[24] and the 50% partnership interest in MCJV held by the MCLT.

The regulations upon which petitioners rely in claiming grantor status do not govern our analysis. In relevant part, section 1.671–2(e)(1), Income Tax Regs., defines a grantor as any person on whose behalf another person creates a trust or any person who directly or indirectly makes a gratuitous transfer of property to a trust. Section 1.671–2(e)(3), Income Tax Regs., includes as a grantor of a trust "any person who acquires an interest in a trust from a grantor of the trust if the interest acquired is an interest in * * * [among other types of trusts] liquidating trusts". The regulations, however, are effective for transfers to a trust, or a transfer of an interest in a trust, on or after August 10, 1999, well after October 10, 1985, the date on which the MCLT was funded. Sec. 1.671–2(e)(7), Income Tax Regs.

Petitioners assert that, although not effective at the time of the MCLT's creation and funding, the regulations were "not intended to change the result of existing law with respect to

owner" and "grantor" interchangeably. In any event, they have neither shown petitioner's satisfaction of sec. 678 nor specifically argued the applicability of sec. 678.

[23] Although petitioners also argue that petitioner is the owner of the MCLT because, pursuant to the plan, he is entitled to "any property remaining [in the MCLT] after paying the claims of creditors", they have neither shown that that entitlement constitutes a reversionary interest within the meaning of sec. 673 nor specifically argued the applicability of sec. 673. We, therefore, do not discuss that argument further.

[24] In docket No. 11606–10L, on brief, petitioners concede that Holywell's NOL carryovers were lost as of October 10, 1985, and that the MCLT "did not have net operating losses [sic] deductions allowable under Section 172". The amounts of any unused losses are very much in doubt.

trusts used for business purposes." They contend that, although not specifically identified, "it is clear from the examples that a liquidating trust" would qualify as a trust used for business purposes. They conclude that, because the MCLT, a liquidating trust, had a business purpose, the regulations "simply codified existing law" and, therefore, its definitions of "grantor" are applicable.

Before the regulations were promulgated, there existed no definition of "grantor" for purposes of sections 671–677. This Court had defined a settlor of a trust (i.e., grantor) generally as one who furnishes the major portion of consideration for the trust's creation. *See, e.g.*, *Bixby v. Commissioner*, 58 T.C. 757, 791 (1972); *Smith v. Commissioner*, 56 T.C. 263, 290 (1971). Moreover, we stated: "In determining the settlors of a trust, we look beyond the named grantors to the economic realities to determine the true grantor." *Zmuda v. Commissioner*, 79 T.C. 714, 720 (1982), *aff'd*, 731 F.2d 1417 (9th Cir. 1984); *CIM Trust v. Commissioner*, T.C. Memo. 2001–172. Petitioner fails to qualify as a settlor of the MCLT. Petitioner did not furnish any, not to mention the major portion of, consideration for the MCLT's establishment. Indeed, the U.S. Supreme Court concluded, in *Holywell Corp.*, 503 U.S. at 57, that "Gould himself did not contribute anything to the trust". On August 22, 1984, petitioner filed a voluntary petition for protection under chapter 11 of the Bankruptcy Code, which created a bankruptcy estate, a separate entity from the individual debtor (i.e., petitioner) for bankruptcy purposes and a separate taxpayer for Federal income tax purposes.[25] Sec. 1398; 11 U.S.C. sec. 541(a) (2006); *Williams v. Commissioner*, 123 T.C. 144, 148 (2004). On that date, all of petitioner's legal or equitable interests in property as of the commencement of the bankruptcy case were transferred to, and vested in, that separate taxable entity. *See* 11 U.S.C. sec. 541(a)(1). Thus, petitioner's bankruptcy estate would take into account those items of income or loss attributable to the property received from him and disposed of by the estate. *See* sec. 1398(e)(1), (g)(6). On October 10, 1985, pursuant to the confirmation plan, petitioner's bankruptcy estate transferred that property directly into the MCLT; we agree with the

---

[25] In contrast, no separate taxable entity results upon the filing of a voluntary petition by a partnership or a corporation for protection under ch. 11 of the Bankruptcy Code. Sec. 1399.

Supreme Court in *Holywell Corp.*, 503 U.S. at 57, that the property did not revest in petitioner before its transfer to the MCLT. [26] Petitioner transferred no property to the MCLT.

Even if section 1.671–2(e), Income Tax Regs., applied to the situation herein, the regulations fail to support petitioners' claim. Section 1.671–2(e)(1), Income Tax Regs., provides that the term "grantor" includes persons creating a trust or directly or indirectly making a gratuitous transfer (i.e., a transfer other than for fair market value, *see* sec. 1.671–2(e)(2)(i), Income Tax Regs.) to a trust. If a person creates or funds a trust on behalf of another person, both persons are treated as grantors of the trust. Sec. 1.671–2(e)(1), Income Tax Regs. Petitioners argue that petitioner is included in that definition of a grantor because the trust was created and funded on his behalf since "The Plan specifically provided that '[a] Trust is hereby declared *on behalf of the Debtors* * * * '. (Emphasis supplied.)".

Petitioners state that, in order for the on-behalf-of rule found in section 1.671–2(e)(1), Income Tax Regs., to apply, "the funding of the trust must be gratuitous". The fact is, however, that neither the funding debtors nor petitioner's bankruptcy estate gratuitously funded the MCLT; they did so because they were compelled to under the plan. Nor can we say that the MCLT was formed on petitioner's behalf, as the term "on behalf of another person" is used in the regulations. Petitioners have identified no cases, nor have we found any, that support their argument that the trust was formed on petitioner's behalf because he, in some sense, might benefit from the trust; i.e., he might receive a portion of the residue of the trust after it liquidated its assets and paid the creditors. A trust is by definition "a property interest held by one person (the *trustee*) at the request of another (the *settlor*) for the benefit of a third party (the *beneficiary*)." Black's Law Dictionary 1647 (9th ed. 2009). If we were to take petitioners'

---

[26] The Court, in *Holywell Corp.*, 503 U.S. at 57, distinguished *In re Sonner*, 53 B.R. 859 (Bankr. E.D. Va. 1985), which applied the grantor trust provisions to make the debtor the grantor of a postconfirmation liquidating trust. The Court stated that, in *In re Sonner*, pursuant to the ch. 11 plan of reorganization, it appeared that the property of the estate had revested in the debtor upon confirmation before being placed by him in trust to pay his creditors. *Holywell Corp.*, 503 U.S. at 57. It added: "In this case [i.e., *Holywell Corp.*], however, the property of Gould's bankruptcy estate did not revest in Gould. The plan, instead, placed all of the estate's property directly in the Miami Center Liquidating Trust. Gould himself did not contribute anything to the trust". We venture no opinion as to whether the assets of petitioner's bankruptcy estate should be deemed distributed to the creditors of that estate before being placed in trust.

meaning for the term "on behalf of", the beneficiary of every trust would, at the same time, be its grantor, a conflation we reject. The regulations contain two examples indicating that the person creates or funds a trust on behalf of another when the former acts for the latter in establishing the trust. *See* sec. 1.671–2(e)(6), *Examples* (*3*), (*8*), Income Tax Regs. That seems a better meaning. Petitioner reimbursed no one's contribution to the MCLT, nor did anyone act for petitioner in funding it; each of the other debtors and petitioner's bankruptcy estate acted for itself, as directed in the plan.

We similarly find that petitioner does not satisfy section 1.671–2(e)(3), Income Tax Regs. The regulations provide that a grantor of a trust includes "any person who acquires an interest in a trust from a grantor of the trust if the interest acquired is an interest in" certain trusts, including liquidating trusts. Sec. 1.671–2(e)(3), Income Tax Regs. We deduce from petitioners' briefs that they contend that petitioner acquired an interest in the MCLT from his bankruptcy estate pursuant to section 1398(i). Section 1398(i), however, addresses the debtor's succession to tax attributes of his bankruptcy estate, not the transfer of legal or beneficial interests in property.

Having found that petitioner was not a grantor of the MCLT, we need not address petitioners' argument that petitioner is the owner of a portion of the trust income. Even if we had found him to be a grantor, petitioners would not prevail on that argument. In support of their argument, petitioners rely on the same Code section, section 677, regulations, section 1.677(a)–1(d), Income Tax Regs.,[27] and case, *In re Sonner*, 53 B.R. 859 (Bankr. E.D. Va. 1985), that were relied upon in *Holywell Corp.*, 503 U.S. at 56–57, and which the U.S. Supreme Court rejected. On brief, petitioners reiterate the same arguments that were rejected by the Court and offer no reason for us to deviate from the Supreme Court's analysis and conclusion.[28]

---

[27] Sec. 1.677(a)–1(d), Income Tax Regs., provides that a grantor is treated as the owner of a portion of a trust whose income "is, or in the discretion of the grantor or a nonadverse party, or both, may be applied in discharge of a legal obligation of the grantor".

[28] Petitioners also argue that petitioner became the sole owner of all of the debtors' property for tax purposes upon the property's vesting in the MCLT. In support of that argument, petitioners assert two alternative grounds. (1) The assignment to the MCLT of all of the property of Holywell and MCC resulted in a deemed liquidating distribution to petitioner as the sole shareholder of Holywell (which had owned MCC). Upon the corporations' liquidations, he also

Continued

Accordingly, we find that petitioner was not a grantor of the MCLT. Therefore, the MCLT did not with respect to him constitute a grantor trust such that a portion of its income and deductions must be reported on petitioners' personal tax returns. They, therefore, are not entitled to take into account in computing their taxable income NOLs belonging to the trust.

(2) *Petitioners Are Not Entitled to NOL Carryovers of Petitioner's Bankruptcy Estate Upon Its Termination.*

Next, petitioners argue that they are entitled to $18,180,307 in NOL carryovers that they claim passed to petitioner from his bankruptcy estate pursuant to section 1398(i). They assert that, upon the bankruptcy estate's termination on October 10, 1985, petitioner succeeded to its NOL carryovers, which consisted of (1) petitioner's NOLs of $11,722,009 to which, on August 22, 1984, the bankruptcy estate had succeeded and that remained unused at its termination, and (2) petitioner's bankruptcy estate's 1984 NOLs of $6,408,298.

Respondent disagrees, primarily contending that, notwithstanding section 1398(i), petitioners are not entitled to those tax attributes because the joint motion, which the bankruptcy court by order approved on September 30, 1993, expressly stated that no tax attributes of petitioner's bankruptcy estate survived upon its termination as of October 10, 1985. He further argues that, even if the joint motion did not extinguish the tax attributes of petitioner's bankruptcy estate, petitioners have not "1) shown how they could be used by petitioners; 2) proven that any allowable NOL carryovers did not expire either before or during the taxable years in question; or, 3) shown that the carryovers were not reduced

became the owner of all of the interests in Chopin and MCLP (which the corporations had owned), which caused the partnerships to terminate pursuant to sec. 708(b)(1)(A) and petitioner to receive a constructive final liquidating distribution. (2) Under the plan's substantive consolidation provision, the debtors were treated as a single economic unit and their property treated as common assets, which, upon assignment to the MCLT, resulted in the liquidation for tax purposes of the corporate and partnership debtors, and petitioner, as the "single common element of interest, control and ownership of all five debtors", became, on October 10, 1985, the sole owner of the property vested in the MCLT. Petitioners acknowledge, however, that their argument depends upon our finding that the MCLT was a grantor trust as to petitioner. Because we have not, we need not address that argument. Consequently, we also need not address the parties' disagreement as to whether Holywell indeed liquidated for tax purposes on October 10, 1985.

by any cancellation of indebtedness income exclusions under Code section 108."

As described *supra* section I.A.2.a.(1)(b) of this report, the filing of an individual's voluntary petition in a chapter 11 bankruptcy creates a new taxable entity (the bankruptcy estate) for Federal tax purposes, separate from the individual debtor. Sec. 1398. The bankruptcy estate succeeds to and takes into account certain tax attributes of the individual debtor (e.g., NOL carryovers) determined as of the first day of the individual debtor's taxable year in which the chapter 11 bankruptcy commences. Sec. 1398(g)(1). Thus, the bankruptcy estate succeeds only to those NOLs, as determined under section 172, generated before the year in which the individual debtor files for bankruptcy. Sec. 1398(g)(1); *Williams v. Commissioner*, 123 T.C. at 150. "The NOLs as determined by a calendar year individual debtor, as of January 1 of the year the debtor files a bankruptcy petition, go to the bankruptcy estate for its exclusive use for the benefit of the creditors on the commencement date." *Benton v. Commissioner*, 122 T.C. 353, 359 (2004).

Upon termination of the bankruptcy estate, the individual debtor succeeds to and takes into account, among other tax attributes, unexpired and unused NOL carryovers of the bankruptcy estate. Sec. 1398(i); *Williams v. Commissioner*, 123 T.C. at 151. That includes both remaining NOLs that the bankruptcy estate succeeded to under section 1398(g)(1) and unused tax attributes accumulated by the operation of the bankruptcy estate. *See Benton v. Commissioner*, 122 T.C. at 358. Before passing to the individual debtor, however, those NOL carryovers are reduced by the amount of discharge of indebtedness income excluded from the debtor's income under section 108(a). Sec. 108(b)(1), (2)(A), (d)(8). Income from discharge of indebtedness is excluded from gross income if "the discharge occurs in a title 11 case". Sec. 108(a)(1)(A).

Petitioners dismiss the joint motion on the grounds Mr. Gould was not a party to the agreement embodied therein, he did not sign it, "[i]t doesn't even mention [him]", and "[i]t likely wasn't even intended to apply to him." While, technically, those claims may be true, they are beside the point. The joint motion addresses the exhaustion of tax attributes of petitioner's bankruptcy estate (not the exhaustion of any of his tax attributes). The joint motion was not self-executing

but was put before the bankruptcy court, which, according to its order of September 30, 1993, approving the settlement embodied in the motion, notified all parties in interest of the motion, held a hearing on the motion, and "considered the objections of Debtor[ ] Theodore B. Gould". Petitioner appealed the order to the U.S. District Court for the Southern District of Florida and the U.S. Court of Appeals for the Eleventh Circuit, both of which affirmed. *See Holywell Corp. v. Smith*, 208 F.3d 1009 (11th Cir. 2000) (unpublished, table); *see also Gould v. United States*, 229 F.3d 1142 (4th Cir. 2000) (unpublished, table); *Holywell Corp. v. Bank of New York (In re Holywell Corp.)*, 177 B.R. 991 (S.D. Fla. 1995), *aff'd without published opinion*, 95 F.3d 57 (11th Cir. 1996). Mr. Gould, as debtor, may succeed only to the tax attributes of his bankruptcy estate remaining in the estate at its termination. *See* sec. 1398(i). And as of October 10, 1985, [29] according to the settlement embodied in the joint motion, approved by the bankruptcy court, the tax attributes of Mr. Gould's bankruptcy estate were exhausted. Petitioners have not showed us any ambiguity in the joint motion or in the bankruptcy court's order, nor have they convinced us that the bankruptcy court lacked authority to grant the motion, with its stated direct consequence for petitioner's bankruptcy estate and its unstated indirect consequence for him. There were, therefore, as of October 10, 1985, no tax attributes of his bankruptcy estate to which petitioner, as debtor, could succeed. He, therefore, succeeded to none; in particular, he succeeded to no NOL. We find accordingly.

Alternatively, respondent argues that petitioners have failed to prove that any available NOL carryovers existed as of October 10, 1985. [30] Petitioners argue that upon petitioner's bankruptcy estate's termination, petitioner succeeded to NOL carryovers of $18,180,307, which included $11,722,009 of his NOL carryovers to which his bankruptcy estate had succeeded on January 1, 1984, and $6,408,298 of NOLs generated during bankruptcy. Petitioners assert that petitioner

---

[29] The parties do not agree on the date of the termination of petitioner's bankruptcy estate. However, because they anchor their respective arguments upon the date of October 10, 1985, we focus on that date in our analysis.

[30] Respondent bearing the burden with respect to fraud to prove by clear and convincing evidence an underpayment in tax, we assume he makes this argument should we reject his first argument and, as with 2002, should the period of limitations not be an issue.

is therefore entitled to carry over $18,180,307 of NOLs to the years at issue, reducing his tax liability for those years accordingly.

The record contains no evidence reliably establishing the amounts of NOLs held by petitioner's bankruptcy estate or that the estate did not exhaust those losses as of October 10, 1985. The only documentary evidence is petitioners' self-prepared "Net Operating Loss Worksheet". The worksheet details petitioners' NOLs beginning in 1982 and ends in 2003, but petitioners acknowledge that it does not attempt "to obtain a precise figure" as to petitioner's losses for tax years 1985–2002. The worksheet indicates that "Petitioner NOL Carryovers to 1984" and "1984 NOL of Bankruptcy Estate" were $11,772,009 and $6,408,298, respectively, identifying as its source respondent's RAR issued to the bankruptcy estate for taxable years ending December 31, 1984, and October 10, 1985. That same RAR, however, indicated that the entire $18,180,307 of NOL carryovers was absorbed to offset taxable income in that later year and, therefore concluded: "There is no carryover to the debtor of any NOL from the estate". Petitioners have introduced no evidence, and indeed we find none in the record, proving otherwise. Petitioner's bankruptcy estate did not file a return for tax year ending October 10, 1985, and petitioners failed to proffer evidence as to income that the estate may have had during that taxable year.[31]

Petitioners have failed to prove that petitioner's bankruptcy estate had an NOL for its tax year ending on October 10, 1985, to which petitioner could succeed and which he could carry over to 1995–2002. Accordingly, petitioners have failed to prove that they are entitled to claim, on their 1995–2002 joint income tax returns, NOL carryovers of $18,180,307.

b. *Capital Loss Deductions*

Petitioners next assert that they are entitled to claim capital loss carryover deductions of $3,000 for 1995–2002. They argue that, in 1991, petitioner incurred a $664,771 short-term bad debt capital loss and a $376,719 long-term capital

---

[31] Because we find that petitioners failed to prove the existence of available NOL carryovers of the bankruptcy estate as of October 10, 1985, we need not consider respondent's additional arguments; i.e., that petitioners failed to prove that any allowable NOL carryovers did not expire either before or during the taxable year in question and that they failed to show that the carryovers were not reduced by any cancellation of indebtedness income under sec. 108.

loss from investments in debt and common stock, respectively, in TBG Associates, Ltd. They contend that they (1) reported a net capital loss of $1,041,490 on the Schedule D, Capital Gains and Losses, attached to their joint 1991 Form 1040, (2) deducted $3,000 of that loss on their 1991 Form 1040, and (3) properly carried forward the excess capital loss, offsetting "$3,000 of the capital loss carryover from 1991 against their taxable income for each year from 1992 through 2002." Finally, they argue that respondent examined their 1991 tax return and, on May 10, 1994, mailed to petitioners a "no adjustments letter" regarding that taxable year. Respondent argues that petitioners have provided "scant evidence" in support of their claimed capital loss deductions. [32]

Generally, taxpayers may claim as a deduction "any loss sustained during the taxable year and not compensated for by insurance or otherwise." Sec. 165(a). Losses from sales or exchanges of capital assets, however, are allowed only to the extent prescribed in sections 1211 and 1212. Sec. 165(f). Under those limitations, noncorporate taxpayers must first offset capital losses against capital gains; if aggregate capital losses exceed aggregate capital gains, taxpayers may deduct up to $3,000 of the excess against ordinary income. Sec. 1211(b). Capital losses exceeding the section 1211(b) limitation may then be carried over to subsequent tax years. Sec. 1212(b).

There is nothing in the record, other than petitioners' 1991 Form 1040, on which they reported the capital loss, and petitioner's self-serving testimony, to substantiate that he incurred a capital loss for 1991 that could be carried to 1995–2002. A taxpayer's returns alone do not substantiate deductions or losses. *Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979); *Thompson v. Commissioner*, T.C. Memo. 2011–291. Absent corroborating evidence, petitioners' returns do not substantiate their entitlement to deduct the 1995–2002 capital loss carryovers.

On brief, petitioners state: "Respondent examined Petitioners' 1991 tax return. On May 10, 1994[,] Respondent mailed Petitioners a 'no adjustments letter' for their 1991 taxable year." To the extent that petitioners argue that the

---

[32] Apparently, respondent does not make that argument to show that, to prove fraud, he has proven an underpayment in tax by clear and convincing evidence. *See supra* note 30.

letter indicates respondent's acknowledgment that the 1991 capital loss was proper, we disagree. The no-change letter did not contain a determination by respondent that petitioner's 1991 capital loss was properly reported, the basis of petitioners' claim to their entitlement to deduct capital loss carryovers for tax years 1995–2002. In the no-change letter, respondent merely notified petitioners that respondent had "examined your tax return for the above period and made no changes to the tax you reported." Petitioners have made no claim of estoppel with respect to the no-change letter. Nor have petitioners explained why respondent was barred from making changes with respect to 1991 after issuing the no-change letter for that year. *See Opine Timber Co. v. Commissioner*, 64 T.C. 700, 713 (1975) (Commissioner's letter accepting return does not bar later determination of a deficiency), *aff'd without published opinion*, 552 F.2d 368 (5th Cir. 1977); *Vlock v. Commissioner*, T.C. Memo. 2010–3. Respondent is not bound by representations in the no-change letter. *Gale v. Commissioner*, T.C. Memo. 2002–54.

Because petitioners have not proffered evidence to substantiate their claimed 1991 long- and short-term capital losses, we find that petitioners are not entitled to the claimed 1995–2002 capital loss carryover deductions. [33]

c. *Conclusion*

Respondent has shown by clear and convincing evidence that petitioners have underpayments of tax for 1995–2002. Petitioners' joint Federal income tax returns for those years show zero tax liability for each year in large part because of NOL carryovers that were sufficient to eliminate any tax that would otherwise be due. Respondent has proven that petitioners are not entitled to those NOL carryovers for 1995–2002. Moreover, petitioners make no argument that they have unclaimed deductions or credits that would reduce their tax liability for each of those years. Petitioners have not shown their entitlement to deduct any capital loss carryovers. To the extent we have jurisdiction to do so, we sustain respondent's adjustments resulting from his disallowance of the NOL and capital loss carryover deductions.

---

[33] We find that petitioners have failed to substantiate the claimed capital loss and, thus, do not address respondent's alternative argument that petitioners failed to reduce the total amount of capital loss carryovers for the $3,000 excess they had claimed each prior year.

3. *Fraudulent Intent*

The second prong of the fraud test requires the Commissioner to prove that, for each year in issue, at least some portion of the taxpayer's underpayment of tax is due to fraud. Fraud for that purpose is defined as intentional wrongdoing, with the specific purpose of avoiding a tax believed to be owed. *DiLeo v. Commissioner*, 96 T.C. at 874. The Commissioner must thus prove that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax. *Id.* A fraudulent state of mind may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. *Id.*

Courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. Those badges of fraud include: (1) understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash. *Bradford v. Commissioner*, 796 F.2d 303, 307–308 (9th Cir. 1986), *aff'g* T.C. Memo. 1984–601; *Scott v. Commissioner*, T.C. Memo. 2012–65. "Although no single factor is necessarily sufficient to establish fraud, a combination of factors is more likely to constitute persuasive evidence." *Scott v. Commissioner*, T.C. Memo. 2012–65. The taxpayer's intelligence, education, and tax expertise are also relevant in determining fraudulent intent. *Id.*

We find that, for 1995–2002, respondent has failed to provide clear and convincing evidence that petitioners filed fraudulent tax returns.

a. *Understatement of Income*

An understatement of income can be shown by an overstatement of deductions. *E.g.*, *Daoud v. Commissioner*, T.C. Memo. 2010–282; *see Hicks Co. v. Commissioner*, 56 T.C. 982, 1019 (1971), *aff'd*, 470 F.2d 87 (1st Cir. 1972). Petitioners claimed significant deduction overstatements, namely (1) NOL deductions of $188,305, $75,355, $39,848, $63,002, $97,478,

$351,331, $105,822, and $121,885 for 1995, 1996, 1997, 1998, 1999, 2000, 2001, and 2002, respectively, and (2) capital loss carryovers of $1,041,490 from which they claimed capital loss deductions of $3,000 for each year from 1995–2002. For those years, they understated their income.

b. *Inadequate Maintenance of Records*

Taxpayers are required to maintain records sufficient to establish the amounts of allowable deductions and to enable the Commissioner to determine the correct tax liability. Sec. 6001. Respondent disallowed the NOL and capital loss deductions for, among other reasons, lack of substantiation. The only records in evidence are petitioner's amended 1995 Form 1040 and 1996–2002 Forms 1040, on which they claimed those deductions, which as discussed *supra*, absent supporting evidence, provide insufficient substantiation. All but one of those Forms 1040 include a self-prepared schedule of NOLs carried over and NOLs used in prior taxable years. We have little confidence in the schedules' accuracy because they do not include supporting evidence as to the origin, or use in pre-1995 taxable years, of the NOL carryovers, they do not account for the expiration of the carryovers, and at least two of the schedules provide inconsistent amounts of NOLs and resulting cumulative carryovers. Although the record contains a copy of a letter from petitioner to the Appeals officer assigned to the deficiency case in which petitioner refers to "source documents from which [his] net operating losses and capital losses can be determined", petitioners neither introduced those documents at trial nor identified any of the stipulated exhibits as the documents referred to in the letter.

Petitioners attributed the NOL carryovers to losses incurred by Holywell, MCLP, MCJV, and Chopin. They introduced, however, only some of those entities' tax returns for some of the examination years, which provide insufficient substantiation.

Petitioner also testified that the capital loss carryover deductions of $3,000 for 1995–2002 arose from a 1991 $664,771 short-term bad debt capital loss and a $376,719 long-term capital loss from investments in debt and common stock, respectively, in TBG Associates, Ltd. He offered no records to support that testimony.

We find petitioners' failure to keep or produce adequate records to support their return positions to be an indicium of fraud.

### c. *Failure To Cooperate With Tax Authorities*

We disagree, however, with respondent's argument that petitioner, in a further attempt to evade Federal income tax, failed to cooperate with tax authorities. Respondent asserts primarily that petitioner, in an effort to evade tax due, often sought retribution against Government employees who disagreed with him. Respondent specifically identifies, among other things, (1) petitioner's commencing an action in the U.S. District Court for the Western District of Virginia against Mr. Smith and BNY in which he sought damages, (2) petitioner's attempt to persuade the U.S. Department of Justice to prosecute BNY for fraud, and (3) petitioner's request that the IRS' criminal investigation unit investigate Mr. Smith and BNY.

The aforementioned efforts, however, were not directed towards Government employees and, more significantly, they were not directed against tax authorities. Thus, they do not furnish evidence of an attempt to prevent the collection of tax. Respondent does not allege, for example, that petitioner refused to comply with document requests or failed to attend scheduled meetings with respondent or otherwise actively impeded the audit. To the contrary, petitioner agreed with respondent's request to extend the period of limitations for assessment for taxable year 2002 so that a more complete audit could be performed.

### d. *Intent To Mislead*

We further disagree that petitioner made misleading statements to an investigating agent, an indicium of fraud. Respondent argues that petitioner filed "amended" Forms 1041 for the MCLT with the intent to mislead respondent into making tax assessments against the trust and "then [to] mislead respondent into thinking that any taxes collected in such manner would serve to eliminate his tax liability".

Respondent has not convinced us that petitioners fraudulently filed the 1997 and 1998 Forms 1041. Petitioners argue that they filed amended returns because the original 1997

Form 1041 was inconsistent with MCJV's 1997 Schedule K–1, and the original 1998 Form 1041 failed to report discharge of indebtedness income arising from the discharge in that year of Mr. Smith's outstanding obligation on the trustee certificate. Respondent has provided no evidence to contradict petitioner's assertion. In addition, petitioner did not mislead respondent into accepting those assessments as estimated tax payments creditable on his personal tax returns. Even before respondent had assessed those amounts, petitioner disclosed to respondent his intention of claiming on his personal tax return taxes owed by, but not collected from, the MCLT for tax year 1997. To their 1998 Form 1040, petitioners attached a disclosure form. That disclosure form appears to reflect petitioners' belief, albeit erroneous, that they were entitled to credit on their personal return $22,871,042 for taxes that had not yet, but should have, been collected from the MCLT for tax year ended December 31, 1997. Disclosure forms attached to petitioners' 2000 and 2001 Forms 1040 appear to reflect petitioners' continuing belief that they were entitled to credit on their personal returns for taxes that had not yet, but should have, been collected from the trust.

Petitioner disclosed to respondent both his reason for filing the MCLT's amended Forms 1041 and that, although claimed as estimated tax payments, the resulting assessments against the MCLT had not yet been paid. Given the disclosure, we cannot say that petitioners misled respondent in order to lower their tax due.

e. *Filing False Documents*

Respondent alleges that petitioner "claimed that there was a new [Holywell] entity [when he filed Holywell's postliquidation tax returns]; however, he continued to use the same incorporation date and make claims to the $10 million paid by the trustee on behalf of Holywell corporation." Respondent concludes that "either petitioner continued to file returns for the Delaware-incorporated Holywell or petitioner claimed payments on the Virginia-incorporated Holywell that were not made and listed the wrong incorporation date for the Virginia-incorporated Holywell", either of which actions amounts to filing false documents.

We find that respondent has failed to prove by clear and convincing evidence that petitioner filed false documents with the purpose of avoiding his tax obligation. As stated *supra*, respondent must prove that, for 1995, 1996, 1997, 1998, 1999, 2000, 2001, and 2002, at least some portion of each of petitioners' underpayments of tax is due to fraud. Even if we were to find that petitioner falsely filed tax returns for Holywell after its liquidation or falsely claimed a refund for the Virginia-incorporated Holywell, such actions do not relate to petitioners' underpayments of tax for 1995–2002. In other words, petitioners' underpayments of tax are not due to the filing of false documents as alleged by respondent.

Respondent also asserts that, because he lacked the authority or fiduciary capacity to do so, petitioner filed false "amended" Forms 1041 on behalf of the MCLT. The filing of the Forms 1041 by themselves did not cause underpayments of tax for 1995–2002.

### f. *Implausible or Inconsistent Explanations of Behavior*

Respondent argues that petitioner's inconsistent explanations of behavior include: (1) filing post-1985 Federal tax returns for a Virginia-incorporated Holywell corporation but using the "incorporation date of the Delaware Holywell" on its tax returns and claiming refunds on behalf of Holywell, an entity that petitioner acknowledged is a separate taxable entity, (2) claiming that the MCLT is a grantor trust but reporting only losses and tax payments but not income attributable to the trust, and (3) providing contradictory statements as to his entitlement to MCJV's losses.

As explained *supra*, petitioners' 1995–2002 underpayments of tax are not due to the filing of those Federal tax returns. Thus, whether or not inconsistent, petitioner's explanations for his behavior do not factor into our analysis.

Most of the disallowed NOLs originate from petitioners' carryover of losses of the MCLT. Petitioner's explanations were not only implausible but nonexistent as to why, after taking the position that the MCLT was a grantor trust, petitioner claimed on his personal tax returns his portions of its losses but failed to report the trust's income. He did not attempt to explain this discrepancy. Petitioner has dem-

onstrated extensive knowledge of the grantor trust rules and is aware that a grantor of a trust must take into account items of both income and deduction. Petitioners' documents and attachments to their Forms 1040 have proved to us that petitioner is extremely well versed in these rules and we cannot attribute his failing to include attributable income to a mistake of a question of law. We can only deduce from petitioner's implausible explanation (or lack thereof) that petitioners selectively reported only the tax benefits associated with a grantor trust in order to evade tax petitioner believed (incorrectly) to be due. We find that petitioner's implausible explanation of behavior is an indicium of fraud.

Although petitioner did provide inconsistent explanations as to his entitlement to deduct losses from MCJV, we do not find that those explanations are evidence of fraudulent intent. In a 1993 deposition in a previous proceeding, when asked about his 1989 tax return in which he listed on the Schedule E, Supplemental Income and Loss, losses from MCJV and MCLP, petitioner responded: "That's a return that has to be amended. * * * Because my limited partnership interests and my joint venture interests have been held by the courts to have been assigned to the Miami Center." The deposition continued as follows:

Q. So, in what way will you amend the return?
A. Eliminate the losses.

\* \* \* \* \* \* \*

A. What I am saying is we will amend the losses belonging to me as the beneficial owner of that property, of the joint venture interest. When the trust is dissolved, those losses will be available to me.
Q. But not in 1989?
A. But not in 1989.

Petitioner explained this discrepancy by testifying: "I was sworn under oath and the question in response to which was a question of law, right, to which I answered, I was mistaken." His entitlement to the losses is a question of law, not of fact, and petitioner later changed his legal position as to the issue. We do not consider a modified legal position by itself an inconsistent explanation of behavior.

We are thus faced with explanations of behavior that both evidence his fraudulent intent and do not. However, because of petitioner's demonstrated knowledge of the grantor trust

rules and his obvious selective reporting in order to obtain a substantial tax benefit, we conclude that, on the whole, petitioner provided implausible explanations of his behavior in order to evade tax known to be owing.

### g. *Conclusion*

After considering the entire record and the factors discussed *supra*, we find that, for 1995–2002, respondent failed to provide clear and convincing evidence that petitioners filed fraudulent tax returns. [34] While petitioner's implausible explanation as to why he claimed losses but did not report income of the MCLT strongly indicates to us his intent to evade tax believed to be owed, no single factor is necessarily sufficient to establish fraud. Even when considered in combination with his understatements of his 1995–2002 income and his failure to maintain adequate records for those years, we cannot conclude that these indicia evidence fraud in the face of the aforementioned indicia that indicate otherwise. Specifically, petitioner's cooperation with tax authorities and his disclosure on his Forms 1040 of the reasons for claiming as estimated tax payments the unpaid assessments against the MCLT's 1997 and 1998 tax years lead us to conclude that, although incorrect in his tax positions, petitioner was not attempting to fraudulently lower his tax due.

Accordingly, the extended limitations period provided in section 6501(c) is inapplicable, and respondent's determinations and adjustments relating to taxable years 1995–2001 are barred.

---

[34] Respondent also argues that petitioners' fraudulent intent is evidenced by petitioner's participation in illegal activities, specifically "purloin[ing and selling] concrete pumps belonging to the trust" and refusing to turn over the proceeds. Respondent further asserts that petitioner's behavior has been "borderline illegal" as evidenced by numerous findings of contempt by the bankruptcy court and one finding of contempt by a U.S. District Court. These activities, however, do not establish an attempt to avoid taxes believed to be owing. On brief, petitioners, who bear the burden of proof as to that issue, argue that the sole source of the capital loss and related carryovers was petitioner's investment in TBG Associates, Ltd. The sale of concrete pumps belonging to the MCLT, therefore, does not provide a basis for the claimed capital loss carryovers and consequently does not evidence petitioner's attempt to evade tax believed to be owing.

B. *Deficiencies in Tax*

1. *Introduction*

Because of the absence of fraud that would extend the three-year period of limitations, pursuant to section 6501(c), respondent may not assess or collect deficiencies in petitioners' 1995–2001 Federal income tax. Respondent may, however, assess and collect any deficiency in petitioners' 2002 Federal income tax. Petitioners bear the burden of proof. *See* Rule 142(a). [35]

2. *Disallowed Deductions*

Respondent disallowed for lack of substantiation $121,885 and $3,000 deducted as net operating and capital losses, respectively, for 2002. As we found *supra* section I.A.2. of this report, petitioners have failed to establish: (1) their entitlement to deduct the NOLs of Holywell, MCC, MCLP, Chopin, MCJV, and petitioner's bankruptcy estate, (2) that they incurred a capital loss for 1991, and (3) the amount of any such loss that may be carried over to 2002.

Petitioners have failed to prove their entitlement to any of the disallowed deductions. Therefore, we sustain respondent's adjustments disallowing the claimed NOL deduction and the capital loss deduction of $121,885 and $3,000, respectively, for 2002.

3. *Credit or Refund of Overpayment of Tax*

Petitioners next argue that they are "entitled to a credit or a refund of [a $13,361,000] * * * overpayment of tax on income attributable to property held by the Liquidating Trust because the Liquidating Trust is a grantor trust and * * * [petitioner] is treated as the owner thereof". Petitioners claim that the $13,361,000 overpayment of tax consists of (1) $13 million in tax payments made, in 1992 and 1993, under the joint motion by the trustee to the IRS on behalf of the MCLT, and (2) $361,000 in additional payments made by the trustee to the IRS on behalf of Holywell for tax-

---

[35] Petitioners make no argument that, pursuant to sec. 7491(a), the burden shifts to respondent. In any event, the record establishes that petitioners do not satisfy the preconditions found in sec. 7491(a)(2) for shifting the burden; e.g., they failed to maintain records and they failed to cooperate with the Secretary in his examinations and investigation, both as required by sec. 7491(a)(2)(B).

able years after July 31, 1986, of which $327,000 was for taxable years covered under the joint motion. They assert that, although Mr. Smith remitted these payments, petitioner should be treated as the taxpayer who made payment because "Petitioner was the owner of the Liquidating Trust for tax purposes and, as such, was required to include items of income, deduction and credit of the Liquidating Trust on his personal tax return". They allege that the entire $13,361,000 in tax payments, which they reported as estimated tax payments on their tax returns, constituted an overpayment of tax because, for 1985–2002, they either incurred a loss or had unexpired NOL carryovers in excess of income. Petitioners conclude that they are thus entitled to a refund of the balance.[36]

At trial, petitioner conceded that he is not entitled to a credit or refund of those payments if this Court concludes that he was not the grantor or the beneficial owner of the trust. Indeed, as detailed above, petitioners' arguments on brief rest upon the assertion that the MCLT was a grantor trust and petitioner its grantor such that items of income, deduction, and credit "passed through to Petitioner and Petitioner is entitled to a credit or a refund of amounts paid by the Liquidating Trustee to Respondent."

We accept petitioner's concession. Because of our finding that the MCLT is not a grantor trust as to petitioner, petitioner is not entitled to a credit or refund for $13 million in payments made, in 1992 and 1993, by the trustee to the IRS on behalf of the MCLT and for $361,000[37] in payments made by the trustee to the IRS on behalf of Holywell for taxable years after July 31, 1986.[38]

---

[36] Petitioners also assert that petitioner must be treated for tax purposes as the one who made $13,361,000 in tax payments because Holywell liquidated for tax purposes when all its property vested in the MCLT and the debtors were substantively consolidated on October 10, 1985. Because of our finding discussed below, we need not consider petitioners' alternative argument.

[37] We are unconvinced as to the amount of the overpayment claimed by petitioners. Petitioners assert that Mr. Smith remitted $361,000 in estimated tax payments on behalf of Holywell, but they fail to produce evidence of those payments. The only evidence in the record of payments to the IRS on behalf of Holywell are transcripts showing "ESTIMATED TAX/FEDERAL TAX DEPOSIT[S]" of $34,316, $75,000, and $20,000 on July 15, 1992, January 15, 1993, and April 15, 1993, respectively. Even if remitted by Mr. Smith, these payments do not fully account for the $361,000 in estimated tax payments claimed by petitioners.

[38] On brief, respondent argues that, even if this Court found that the MCLT was a grantor trust as to petitioner, petitioners' claim for a refund or credit for amounts paid by the liquidating trustee in 1992 and 1993 is barred as untimely pursuant to sec. 6511. In the light of petitioner's concession at trial and our finding that the MCLT is not a grantor trust as to petitioner, we need not address that issue.

4. *Abatement of Assessments*

Finally, petitioners argue that respondent improperly abated assessments of income tax against the MCLT for taxable years 1997 and 1998. Upon receipt of the MCLT's amended 1997 and 1998 Forms 1041, respondent assessed the MCLT's 1997 tax liability of $22,871,041 and its 1998 tax liability of $8,672,291. Petitioners reported those unpaid assessed amounts as estimated tax payments on their joint tax returns and applied a portion of those estimated tax payments to their 2002 Form 1040. Respondent later abated the assessments.

The Secretary is authorized to abate the unpaid portion of an assessment of any tax or liability in respect thereof that is, among other things, erroneously or illegally assessed. Sec. 6404(a)(3). If an assessment is properly abated, the abatement entirely extinguishes the assessment. *Becker v. IRS (In re Becker)*, 407 F.3d 89, 97 (2d Cir. 2005). On brief, the parties focus their arguments primarily on whether respondent's abatement was of an erroneous assessment as defined under section 6404(a)(3).

We lack jurisdiction to determine the propriety of respondent's abatement of those assessments against the MCLT. Although it was not raised by either party, this Court may question jurisdiction at any time, even after the case has been tried and briefed. *Smith v. Commissioner*, 124 T.C. 36, 40 (2005). It is well settled that in a deficiency case this Court lacks jurisdiction to provide relief other than to "redetermine the correct amount of the deficiency", sec. 6214(a), and "may exercise jurisdiction only to the extent authorized by Congress", *Estate of Gudie v. Commissioner*, 137 T.C. 165, 170 (2011). Petitioners' abatement claim does not fall within our jurisdictional bounds. As we found *supra* section I.A.2.a.(1)(b) of this report, the MCLT is not a grantor trust as to petitioner; and therefore he is deprived of entitlement to report items of income, loss, and estimated tax payments on his personal tax returns. Even if we were to exercise jurisdiction and find the assessments proper, petitioners may not claim on their 2002 tax return, as estimated tax payments applied from previous tax returns, any assessed and collected income taxes against the MCLT. Our determination regarding the propriety of the assessments of tax against

the MCLT would, therefore, not redetermine the correct amount of petitioners' 2002 deficiency. We decline to adjudicate the issue.

### C. *Imposition of the Accuracy-Related Penalty* [39]

#### 1. *Introduction*

Section 6662(a) and (b)(1)–(3) imposes an accuracy-related penalty in the amount of 20% of the portion of an underpayment of tax attributable to, among other things, negligence or disregard of rules or regulations, any substantial understatement of income tax, or any substantial valuation misstatement. The accuracy-related penalty, however, does not apply to any part of an underpayment if it is shown that the taxpayer acted with reasonable cause and in good faith with respect to that portion. Sec. 6664(c)(1).

The Commissioner bears the burden of production with respect to penalties. Sec. 7491(c). To meet that burden, he must produce evidence regarding the appropriateness of imposing the penalty. *Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once the Commissioner carries his burden, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause. *Id.*

In the notice of deficiency, as an alternative to the fraud penalty under section 6663(a), respondent determined the accuracy-related penalty for tax year 2002 upon the grounds of substantial understatement of income tax and negligence. Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the aforementioned grounds. Sec. 1.6662–2(c), Income Tax Regs.

#### 2. *Substantial Understatement of Income Tax*

Section 6662(a) and (b)(2) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return which is attributable to any substantial understatement of income tax. An "understatement of

---

[39] Although respondent determined the accuracy-related penalty in the notice of deficiency, he failed to address it in his opening brief; he did so, however, in his reply brief. Petitioners anticipated the argument and addressed it in their opening brief. We do not consider respondent to have conceded the issue.

income tax" generally means the excess of the amount of tax required to be shown on the return for the taxable year, over the amount of the tax imposed which is shown on the return. Sec. 6662(d)(2)(A). The understatement is deemed "substantial" if the amount of the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6662(d)(1)(A).

The amount of the understatement, however, is reduced by that portion of the understatement attributable to the tax treatment of any item (1) supported by substantial authority or (2) for which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of such item. Sec. 6662(d)(2)(B). Adequate disclosure has no effect, therefore, where the return position lacks reasonable basis. Sec. 1.6662–3(c)(1), Income Tax Regs. Reasonable basis is a "relatively high standard of tax reporting" and is "not satisfied by a return position that is merely arguable or that is merely a colorable claim." Sec. 1.6662–3(b)(3), Income Tax Regs.

We have sustained respondent's disallowance of the claimed NOL and capital loss deductions of $121,885 and $3,000, respectively, for tax year 2002. The resulting understatement of income tax exceeds the greater of 10% of the tax required to be shown on the 2002 return ($4,109) or $5,000. Respondent has met his burden of production regarding the existence of a substantial understatement.

Petitioners assert that they are not liable for the section 6662(a) penalty on the ground of disregard of rules or regulations because they adequately disclosed their return position and the position "was sound in all respects". In support of their argument, petitioners urge us to adopt the following proposed finding: "The disclosures attached to Petitioners' tax returns explained the tax credits, net operating losses and net capital losses to which Petitioner believed he was entitled as the beneficial owner of the Liquidating Trust under the Supreme Court's opinion in *Holywell*."

Although petitioners raise this argument as a defense against the section 6662(a) penalty on the ground of dis-

regard of rules or regulations, [40] we deem them to have raised it in defense of the section 6662(a) penalty on the ground of substantial understatement of income tax. Because petitioners refer only to those NOLs attributable to the MCLT and not to those petitioner claimed, for 1985, as successor to his bankruptcy estate, we assume that they argue for a partial reduction in the amount of the understatement for 2002.

We are unpersuaded by petitioners' argument that *Holywell Corp. v. Smith*, 503 U.S. 47, provides a reasonable basis for their return position. As explained *supra* section I.A.2.a.(1)(a) of this report, the U.S. Supreme Court stated that it "fail[ed] to see how the respondents can characterize * * * [petitioner] as the grantor" of the MCLT, and the Court did not address whether petitioner was the trust's beneficial owner. *Id.* at 57. We cannot conclude that petitioners meet the relatively high standard of tax reporting demanded by reasonable basis when their position is based on an opinion that is silent as to the issue. Further, petitioners assert that they incurred the 1991 capital loss from which the capital loss carryover in issue resulted from an investment in TBG Associates, Ltd. We do not see, and petitioners have not explained, the relevance of *Holywell Corp.* to that tax position.

We find it curious that petitioners anchor their reasonable basis argument on a case that they assert holds that petitioner may claim deductions as beneficial owner of the MCLT when, in support of all other arguments made on brief, petitioners predicate their entitlement to those same loss carryovers on petitioner's status as grantor. It may be that petitioners use the term "beneficial owner" interchangeably with that of "grantor". If they are asserting a different argument, however, they have not shown any authority to support that new contention. In any event, given our finding and accompanying discussion *supra* section I.A.2.a.(1)(b) of this report, that section 1.671–2(e), Income Tax Regs., fails to support petitioner's tax position that he is grantor of the trust, we find that petitioners lacked a reasonable basis in reporting, on their joint 2002 Form 1040, an NOL deduction

---

[40] We differentiate here between the penalty for negligence and the penalty for disregarding rules or regulations because the accuracy-related penalty on the ground of negligence may not be avoided by disclosure of a return position, irrespective of whether the position has a reasonable basis. Sec. 1.6662–7(b), Income Tax Regs.

related to losses attributable to the MCLT and a capital loss carryover.

Consequently, we find that petitioners have failed to show that the substantial understatement should be reduced because they had a reasonable basis for reporting NOL and capital loss deductions on their joint 2002 tax return. [41] Therefore, we need not address the adequacy of the disclosure of their tax position. *See* sec. 1.6662–3(c)(1), Income Tax Regs.

Accordingly, petitioners are liable for the 20% accuracy-related penalty under section 6662(d) for tax year 2002 unless they meet the section 6664(c) exception for reasonable cause and good faith. Because of section 1.6662–2(c), Income Tax Regs., we need not address the applicability of the penalty based upon the ground of negligence.

### 3. *Section 6664(c) Reasonable Cause Defense*

A taxpayer may avoid the section 6662(a) penalty by showing that he had reasonable cause for a portion of the underpayment and that he acted in good faith with respect to that portion. Sec. 6664(c)(1). Reasonable cause requires that the taxpayer exercise ordinary business care and prudence as to the disputed item. *United States v. Boyle*, 469 U.S. 241, 246 (1985). That determination is made on a case-by-case basis, taking into account all pertinent facts and circumstances, including the taxpayer's knowledge and experience. *Woodsum v. Commissioner*, 136 T.C. 585, 591 (2011); sec. 1.6664–4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his proper tax liability. Sec. 1.6664–4(b)(1), Income Tax Regs.

A taxpayer may demonstrate reasonable cause through good-faith reliance on the advice of an independent professional, such as a tax adviser, lawyer, or accountant, as to the item's tax treatment. *Boyle*, 469 U.S. at 251; *Canal Corp. & Subs. v. Commissioner*, 135 T.C. 199, 218 (2010). To prevail, the taxpayer must show that he: (1) selected a competent adviser with sufficient expertise to justify reliance, (2) supplied the adviser with necessary and accurate information,

---

[41] We do not consider petitioners' argument as it relates to tax credits because the understatement of tax in 2002 is not attributable to petitioners' claim for credits.

and (3) actually relied in good faith on the adviser's judgment. *See 106 Ltd. v. Commissioner*, 136 T.C. 67, 77 (2011), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012). The professional's advice must be based on all pertinent facts and circumstances; "if the adviser is not versed in the nontax factors, mere reliance on the tax adviser may not suffice." *Todd v. Commissioner*, T.C. Memo. 2011–123; *see also Freytag v. Commissioner*, 89 T.C. 849, 888 (1987), *aff'd*, 904 F.2d 1011 (5th Cir. 1990), *aff'd*, 501 U.S. 868 (1991).

Petitioners claim that they acted with reasonable cause and in good faith in reporting the NOL and capital losses and related carryover deductions on their joint 2002 Form 1040 because (1) their "returns were carefully prepared, with the assistance of either or both a qualified certified public accountant or tax counsel", and (2) they "made a full and honest attempt to assess [their] tax liability".

Petitioners do not identify the aforementioned "qualified certified public accountant or tax counsel". After reviewing the record, we construe petitioners' argument to be that they relied on (1) Mr. Schumacher, a certified public accountant, to accurately prepare the Federal tax returns on which petitioners reported the NOLs and capital losses, and (2) their attorney, Mr. Musselman, to review petitioners' self-prepared 2002 Form 1040 and "the returns filed by Petitioner on behalf of the Liquidating Trust as its beneficial owner for taxable years 1997 and 1998."

Petitioners failed to prove that Messrs. Schumacher and Musselman were competent tax advisers with sufficient expertise to justify their reliance. Petitioners introduced no evidence regarding their particular expertise in analyzing grantor trust arrangements or bankruptcy law for Federal income tax purposes. *See 106 Ltd. v. Commissioner*, 136 T.C. at 77. Petitioners similarly failed to show that they provided either man with the necessary and accurate information to properly prepare or review their joint tax returns. Petitioners introduced no evidence that they provided Mr. Musselman with pertinent details underlying the tax items reported on their 2002 tax return or that they provided Mr. Schumacher with any information with which to properly prepare their Federal tax returns. For example, petitioners did not proffer evidence that they provided Mr. Schumacher with information as to petitioner's entitlement to succeed to the NOLs of

his bankruptcy estate or to the capital loss petitioner pur-
ports to have incurred in 1991. Although Mr. Schumacher
prepared financial information for MCJV, MCLP, and Chopin
from which the entities' Schedules K–1 were prepared, and
prepared petitioners' 1991–94 Forms 1040 from those Sched-
ules K–1, the record is silent as to petitioners' role in sup-
plying to Mr. Schumacher all necessary information to
ensure accurate preparation of those Forms 1040.

   In addition, petitioners have not proved that they received
or relied upon the advice of Mr. Schumacher or Mr.
Musselman regarding the tax treatment of the NOL and cap-
ital losses and their entitlement to carry over those losses to
their 2002 Form 1040. In order to constitute "advice" under
section 1.6664–4(c)(2), Income Tax Regs., the communication
must reflect the adviser's "analysis or conclusion." *Woodsum
v. Commissioner*, 136 T.C. at 593 ("The taxpayer must show
* * * that he 'relied in good faith on the adviser's *judg-
ment*.'" (quoting *Neonatology Assocs., P.A. v. Commissioner*,
115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002))).
Petitioners proffer that Mr. Musselman reviewed petitioners'
2002 self-prepared return and that they relied on his advice;
petitioners, however, did not specify the nature or substance
of the advice. Petitioners similarly failed to establish that
Mr. Schumacher exercised judgment or made a professional
recommendation when preparing petitioners' 1991–94 Forms
1040. Reliance on the mere fact that a certified public
accountant has prepared a tax return does not mean that he
"opined on any or all of the items reported therein."
*Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 100.

   We also find that petitioners failed to make a good-faith
effort to assess their proper 2002 tax liability. Petitioners
argue that petitioner "made a full and honest attempt to
assess his tax liability, and fully disclosed his position to
Respondent. * * * Respondent cannot use his disagreement
with Petitioner's interpretation of the facts and the law as
grounds for a penalty." In support of their contention, peti-
tioners direct us to, among others, the following proposed
findings: (1) petitioners disclosed to respondent, on their
1997 and 1998 Forms 1040, the amounts of taxes that the
liquidating trustee had paid and that the assessed 1997 and
1998 taxes against the MCLT remained unpaid, and (2) peti-
tioners' tax returns fully explained the tax credits, NOLs, and

net capital losses to which they believed they were entitled under *Holywell Corp. v. Smith*, 503 U.S. 47.

Even assuming that we were to make those proposed findings, which we do not, they do not establish the steps taken to verify the accuracy of the purportedly disclosed tax positions. Petitioners presented no evidence that they researched or otherwise determined the proper tax treatment of the NOLs, both from the MCLT and petitioner's bankruptcy estate, and capital losses. As stated *supra* section I.C.2. of this report, we do not find that petitioner, an educated and successful businessman, could in good faith have reasonably based his tax position on the U.S. Supreme Court's decision in *Holywell Corp*. Finally, the record is devoid of any evidence of petitioners' attempts to ascertain the correctness of the 2002 capital loss carryover generated from an unsubstantiated 1991 capital loss.

Petitioners have not carried their burden of proving that they acted with reasonable cause and in good faith in claiming the NOL carryover deduction and the capital loss carryover on their joint 2002 Form 1040.

### 4. *Conclusion*

Petitioners are liable for the section 6662(a) penalty as applied to the underpayment of tax determined herein for taxable year 2002.

## II. *Collection Proceeding Regarding Petitioners' 1995, 1999– 2003, and 2005–07 Tax Liabilities*

Finally, we decide whether: (1) respondent may proceed by levy with the collection of petitioners' self-reported self-employment taxes, accrued interest, and penalties, for tax years 1995, 1999–2003, and 2005–07 pursuant to section 6330, (2) Appeals abused its discretion in sustaining the filing of the notice of Federal tax lien for tax years 2000– 2003 and 2005–07, and (3) Settlement Officer DeVincentz abused his discretion in refusing petitioners a face-to-face CDP hearing for tax years 2000–2003 and 2005–07.

Section 6321 imposes a lien for unpaid Federal taxes, which arises when an assessment is made. Sec. 6322. The Secretary must notify the taxpayer in writing of the filing of a notice of lien and, among other things, the taxpayer's right

to request a hearing on the matter. Sec. 6320(a). Section 6320(c) requires that that hearing be conducted pursuant to section 6330(c), "(d) (other than paragraph (2)(B) thereof), (e), and (g)".

Section 6331(a) authorizes the Secretary to levy upon property and property rights of a taxpayer liable for taxes who fails to pay those taxes within 10 days after notice and demand for payment is made. Section 6331(d) requires that the Secretary give written notice to the taxpayer of his intent to levy, and section 6330(a) requires the Secretary to send the taxpayer written notice of his right to a hearing before Appeals at least 30 days before any levy begins.

If the taxpayer requests a hearing in response to either a notice of Federal tax lien or a notice of levy, he may raise at the hearing "any relevant issue relating to the unpaid tax or the proposed levy". Sec. 6330(c)(2)(A). He may also challenge the existence or amount of the underlying tax liability if he did not receive a statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute the tax liability. Sec. 6330(c)(2)(B).

We have jurisdiction over the determination made by Appeals, and our jurisdiction is defined by the scope of that determination. Sec. 6330(d)(1); *Freije v. Commissioner*, 125 T.C. 14, 25 (2005).

Petitioners filed hearing requests in response to the notices of levy and the lien notice challenging Appeals' determination on the ground that, in 1992 and 1993, the liquidating trustee "made payments to the Internal Revenue Service of $13,361,000 [42] for which * * * [petitioners] should receive a credit" and which offset their 1995, 1999–2003, and 2005–07 self-employment tax liabilities. [43] On brief, both parties raised the jurisdictional issue, specifically, whether, under *Freije*, petitioners' claim to credits against their 1995, 1999–2003, and 2005–07 tax liabilities for overpayments from non-CDP years is a "relevant issue relating to the unpaid tax or

---

[42] We note that petitioners' hearing request for 1995 indicates an amount of taxes paid by Mr. Smith ($13,347,000) different from those in the hearing request for 1999 and the levy and lien hearing requests for 2000–2003 and 2005–07 ($13,361,000).

[43] On brief, respondent argues that petitioners also claim credits attributable to "alleged income taxes of MCLT for 1997 and 1998". In each of the hearing requests and on brief, petitioners assert that their claim for a credit is based upon payments by the liquidating trustee of $13.3 million to the IRS. We, therefore, do not address respondent's additional argument.

the proposed levy" for those years such that we have jurisdiction to review Appeals' determination.

We do not reach the issue of our authority under section 6330(d)(1) to decide petitioners' claim of overpayments from prior years because that claim is time barred. [44]

Section 6402(a) permits the Secretary to credit the amount of an overpayment, including any interest allowed thereon, against "any liability in respect of an internal revenue tax on the part of the person who made the overpayment". As we recently stated in *Brady v. Commissioner*, 136 T.C. 422, 427 (2011), in certain situations this Court has considered a taxpayer's claim that his liability for the year involved in a section 6330 collection proceeding should be offset by overpayments in other years. [45] We explained that the taxpayer's entitlement to credits against his unpaid tax for a determination year for an alleged overpayment in a prior year depends on whether he asserted his overpayment claim within the applicable period of limitations. *Id.* at 428 ("[I]f petitioner's overpayment claims are statutorily time barred (assuming arguendo that there was an overpayment), any claim that overpayments are available as a credit to offset the 2005 tax liability would also be time barred."). A claim for credit or refund of an overpayment must be filed "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid." Sec. 6511(a).

Mr. Smith remitted $13 million to the IRS in 1992 and 1993 [46] as estimated tax payments and advance payments on behalf of the MCLT and Holywell for taxable years 1985–91.

---

[44] Respondent also argues that this Court lacks jurisdiction because petitioners "do not raise viable underlying liability issues" under sec. 6330(c)(2)(B). Because we find *infra* that petitioners' claim of overpayments from prior years is time barred, we need not address respondent's additional argument.

[45] *See, e.g.*, *Freije v. Commissioner*, 125 T.C. 14 (2005); *Landry v. Commissioner*, 116 T.C. 60 (2001); *Conn v. Commissioner*, T.C. Memo. 2011–166.

[46] On brief, respondent asserts that the payments at issue were remitted in 1993 and 1994; in his proposed findings of fact, however, he refers to 1992 and 1993 as the relevant years. We assume a typographical error in respondent's brief because Stipulated Exhibit 61 contains copies of checks and an account activity summary which indicate the payments occurred in 1992 and 1993.

As stated *supra* note 37, we are unconvinced as to petitioners' assertion that Mr. Smith remitted to the IRS $361,000 in estimated tax payments on behalf of Holywell. We need not concern ourselves with this issue, however, because the only evidence in the record of payments to the IRS on behalf of Holywell shows that they were made in 1992 and 1993; thus, all alleged overpayments claimed by petitioners arose, if they did arise, in 1992 and 1993.

The MCLT and Holywell did not file Federal tax returns for those years. Petitioners, asserting that petitioner should be treated as the taxpayer who remitted the payments because the MCLT is a grantor trust as to him and because he "did not have taxable income for the applicable years", claimed a credit or refund of those alleged overpayments. Petitioner did so, at the earliest,[47] on September 25, 1997, the date on which he filed petitioners' amended 1995 joint Form 1040, claiming estimated tax payments of $3,103,406 and reporting an overpayment of $3,091,159. Petitioners' claim for a credit or refund of the 1992 and 1993 payments occurred more than two years after Mr. Smith had remitted the payments to the IRS. Petitioners, therefore, did not timely claim a credit or refund of those overpayments with respect to the nondetermination years. Their claim of credits against their 1995, 1999–2003, and 2005–07 self-employment tax liabilities for overpayments is time barred.

As to years 2000–2003 and 2005–07, petitioners also argue that they did not receive a CDP hearing and that Settlement Officer DeVincentz abused his discretion in failing "to grant the petitioner's statutory right to a face-to-face [CDP] hearing". Because this is not a challenge to the underlying tax liabilities, we review this issue for abuse of discretion. *See Sego v. Commissioner*, 114 T.C. 604, 610 (2000).

Although a CDP hearing may consist of a face-to-face conference, it may also be conducted by telephone, by correspondence, or by review of documents. Sec. 301.6330–1(d)(2), Q&A–D6, Proced. & Admin. Regs. There is sufficient evidence in the record to support a finding that, during the examination, petitioner spoke to, corresponded with, and sent documents to, Settlement Officer DeVincentz. We find that petitioner was afforded a CDP hearing. Settlement Officer DeVincentz did not abuse his discretion in refusing petitioner's request for a face-to-face CDP hearing at a specific location because such a hearing would have been futile. *E.g.*, *Busche v. Commissioner*, T.C. Memo. 2011–285, 2011 WL 6089879, at *13 ("[A] face-to-face hearing may be granted only upon a showing that there is something to be accomplished at a face-to-face hearing."). First, as we found *supra*, petitioners' claim that the liquidating trustee's payments to

---

[47] Petitioners' joint 1992–95 Forms 1040 do not report overpayments.

the IRS offset their 2000–2003 and 2005–07 self-employment tax liabilities is time barred. Even assuming that their claim was not time barred, considering the evidence and our finding that petitioner was not a grantor of the MCLT, petitioners' argument was groundless. Petitioners were not entitled to claim those credits on their tax returns and had made the same argument numerous times before both Appeals and other courts. Indeed, the notice of determination for 2000–2003 and 2005–07 stated that petitioners could not challenge the liabilities in their CDP hearing because "This issue [claim to credits] has been repeatedly challenged by the taxpayer and ruled against him." Petitioners did not propose any collection alternatives. Therefore, a face-to-face hearing would not have been productive. Under these circumstances, it was not an abuse of discretion for Settlement Officer DeVincentz to refuse to conduct a face-to-face hearing.

III. *Conclusion*

To reflect the foregoing,

*Decisions will be entered under Rule 155*.

———————————

APPENDIX
As of Jan. 1, 1983